**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JACKIE SKROUPA, Administrator of the Estate of Collin Anthony Randza and on her own behalf, and M.R., a minor, by and through her parent and natural guardian, Jackie Skroupa, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 23-2008 |
| SHALER AREA SCHOOL DISTRICT and the PENNSYLVANIA DEPARTMENT OF EDUCATION, | ) ) ) ) | Magistrate Judge Dodge |
| Defendants. | ) ) ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Jackie Skroupa ("Skroupa"), as the Administrator of the Estate of her deceased son, Collin Anthony Randza ("Collin"), on her own behalf, and on behalf of her minor daughter, M.R., bring this civil rights action against the Shaler Area School District (the "District") and the Pennsylvania Department of Education (the "PDE"). This action arises out of the Defendants' alleged failure to provide appropriate services and counseling to Collin, who ultimately committed suicide, and to his sister M.R., who has continuing mental health and service needs.

The Complaint raises claims under Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12134 ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (Section 504), the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-82 ("IDEA"), and the due process clause of the Fourteenth Amendment to the United States Constitution.

Pending before the Court are separate motions to dismiss filed by the District (ECF No. 14) and the PDE (ECF No. 18). For the reasons that follow, the District's motion will be granted

in part and denied in part and the PDE's motion will be denied.[1]

I. **Procedural History**

Plaintiffs commenced this action on November 17, 2023 (ECF No. 1). Subject matter jurisdiction is based on the federal claims asserted, 28 U.S.C. § 1331. The Complaint alleges that the District violated Collin's rights under Section 504 (Count I) and the ADA (Count II), M.R.'s rights under Section 504 (Count III) and the ADA (Count IV), Skroupa's associational rights under both Section 504 and the ADA (Count V) and Collin's right to life and Skroupa's right to familial integrity as protected by the due process clause (Count VI). Further, Plaintiffs assert a claim for failure to train District employees and agents to properly identify students with mental health needs (Count VII).[2] Finally, Count VIII alleges that the PDE is liable for violating the rights of Plaintiffs under Section 504 and the IDEA.

On January 22, 2024, the District filed a motion to dismiss (ECF No. 14), which has been fully briefed (ECF Nos. 15, 24). The PDE filed a motion to dismiss on January 23, 2024 (ECF No. 18) which has also been fully briefed (ECF Nos. 19, 26).

II. **Relevant Background Facts**

Collin was a 13-year-old boy who took his own life on January 6, 2022. His older sister, M.R., found his body. (Compl. ¶¶ 23-25, 32-33.)

Collin was diagnosed with Obsessive Compulsive Disorder ("OCD") in 2018, and began receiving outside mental health and counseling services in 2020. Jackie Skroupa, his mother,

---

[1] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1) to conduct any and all proceedings and order the entry of judgment. (ECF Nos. 13, 16, 17.)

[2] Counts VI and VII are brought under 42 U.S.C. § 1983.

informed the District that Collin was receiving OCD treatment outside of school, but the District failed to initiate an evaluation of Collin or otherwise offer him appropriate support to address his needs within the school setting. In an effort to support Collin despite the District's failure to take any action, Skroupa requested a space in the school where Collin could go to participate in virtual counseling each day. The District refused this request, however, which forced Collin to access his outside therapy appointments from his mother's car in the District's parking lot. Despite knowledge of Collin's increasing struggles, the District failed to initiate an evaluation to determine if he qualified for additional special education support. (*Id.* ¶¶ 26-31.)

M.R. is a twelfth-grade student in the District. She experienced academic success in the District which continued into her tenth-grade year in August 2021. Following the loss of her brother in January 2022, the District took no steps to provide counseling to M.R. or Collin's classmates. Although M.R. had a history of anxiety and depression prior to her brother's death, her symptoms increased significantly in January 2022. (*Id.* ¶¶ 34-36.) In an effort to support her, M.R.'s parents identified an appropriate outpatient mental health provider who began counseling sessions with M.R. in January 2022.

M.R. returned to school about two weeks after her brother's death. Upon her return to school, no one from the District reached out to her to provide support or to check in to see how she was doing. In fact, nothing occurred at all until the elementary school counselor came to the middle school four weeks later. This was only after it became apparent that Collin's family and friends were not receiving the support they needed from the middle school counselor. (*Id.* ¶¶ 37-39.)

M.R.'s struggles were apparent, and by the end of the school year she had missed an uncharacteristic twenty days of school in addition to arriving late fourteen times. Her grades also

3

dropped. (*Id.* ¶¶ 40-41.)

On May 18, 2022, the District shared a post on its Facebook page for Mental Health Awareness Month. The post stated that there was a school beautification project that had started in January 2022, with around 120 students and staff taking a break from exams to paint blank canvases. The canvases were then screen printed with positive messages of belonging, mental health awareness, and suicide prevention. The goal of this project was to spread positivity and hope, as well as to reduce the stigma surrounding mental health. Skroupa was extremely disappointed that the District failed to mention Collin in connection with this project, or with Mental Health Awareness Month. (*Id.* ¶¶ 42-43.)

On June 1, 2022, M.R.'s Honors English teacher, Mr. Schott, asked the class for honest feedback on his course. In her response, M.R. told Mr. Schott that he knew that she needed help but failed to take any action.(*Id.* ¶ 44.) According to Plaintiffs, after receiving this response from M.R., the District failed to initiate an evaluation to determine her eligibility for special education services. Further, a Section 504 Plan was not developed or implemented. (*Id.* ¶ 45.)

On June 2, 2022, the Middle School Principal informed Skroupa that when students' names were being called to pick up yearbooks, a school employee inadvertently called Collin's name twice over the PA system. The same day, M.R. was called to the guidance office, where she was met by two counselors who wanted to discuss the letter that she wrote to Mr. Schott. Rather than offering support, these counselors asserted that they could not have known that she needed help, effectively blaming M.R. for not reaching out to the administration. This was the first time since her brother's death that M.R. had been contacted by the guidance office. (*Id.* ¶¶ 46-47.)

On June 15, 2022, Skroupa received an email from the mother of Collin's best friend, who was contacting parents to set up a support group for the children who were grieving Collin's loss.

Despite knowledge that its policies and procedures were deficient, the District failed to make changes or train staff after Collin's death, and thus continuing to fail its students. (*Id.* ¶¶ 48-49.)

When the 2022-2023 school year began, M.R. was struggling. About six days after the school year began, Skroupa received a phone call from LeeAnn Guido, the high school's social worker. Guido expressed that she was eager to help M.R., and provided Skroupa with information regarding Shaler's Area Academy. This is a program for students, including those with special needs, who are at-risk for failing to graduate. Guido explained that she felt the program would be appropriate for M.R. given the tragedy that she had experienced. Even after this suggestion, however, the District took no steps to initiate an evaluation or to implement a Section 504 Plan. (*Id.* ¶¶ 50-53.)

Ultimately, M.R.'s family determined that she would try to attend school in person for two periods, and then return home to complete her other work virtually. After M.R. continued to struggle by the end of the first grading period, her family elected to switch to the Academy program. M.R. was then enrolled in math, science, and social studies through the Academy's online platform. (*Id.* ¶¶ 54-55.)

In November 2022, M.R. participated in a psychiatric evaluation at Services for Teens at Risk (STAR), an outpatient program associated with UPMC Western Behavioral Health. Based on the evaluation and subsequent appointments, M.R. was diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, Social Anxiety Disorder, and Post-traumatic Stress Disorder. On November 29, 2022, the STAR program provided the family with a letter to share with the District that outlined M.R.'s mental health diagnoses, and specifically explained that STAR "would like to support [M.R.] in obtaining a 504 plan." The District ignored STAR's suggestion, however, and failed to initiate an evaluation or develop a Section 504 Plan for M.R. at

that time. (*Id.* ¶¶ 56-58.)

The family was unaware that the District had not moved forward with the development of a 504 Plan. It was not until late January 2023, when counsel requested records for M.R., that the family discovered that no 504 Plan had been prepared. Rather than quickly working to resolve the situation, the District's first response was to attempt to shift the blame to the family, suggesting that attempts to secure authorization to proceed with the development of such a plan were ignored.

It was not until early February 2023 that the District issued a Permission to Evaluate. Despite the family's request that a 504 Plan be immediately developed and implemented while the evaluation was conducted, the District ignored this request. (*Id.* ¶¶ 59-61.) Instead, the District requested meetings which the family was not interested in attending as they were unwilling to further delay this matter. Instead, they provided a detailed list of accommodations to the District through their counsel, asking again that a 504 Plan be implemented immediately. However, a draft 504 Plan was not provided until March 22, 2023—the same date that the Evaluation Report draft was shared. As of March 2023, M.R. continued to struggle with attendance, having missed forty-one of 122 two school days, even with a modified schedule and shortened school day.

According to the Complaint, the District's failure to appropriately respond to M.R.'s well-documented needs and subsequent mental health diagnoses is evidence of its systemic failure to evaluate, identify, and develop a program for students requiring emotional and mental health support. (*Id.* ¶¶ 62-64.)

## III.   Discussion

### A.   The District's Motion to Dismiss

#### 1.   Standards of Review

The District argues that Plaintiffs failed to exhaust their administrative remedies for claims

that could have been raised under the IDEA prior to bringing suit. Because it raises this argument as a jurisdictional matter, it must be evaluated under Rule 12(b)(1). *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 130 (3d Cir. 2017).[3]

The District's motion to dismiss also asserts that the Complaint fails to state a claim upon which relief may be granted. Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "This requires a plaintiff to plead "sufficient factual matter to show that the claim is facially plausible," thus enabling "the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). While the complaint "does not need detailed factual allegations . . . a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As noted by the Third Circuit in *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), a 12(b)(6) inquiry includes identifying the elements of a claim, disregarding any allegations that are no more than conclusions and then reviewing the well-pleaded allegations of the complaint to evaluate whether the elements of the claim are sufficiently alleged.

---

[3] Although the Court of Appeals has expressed "some doubts as to whether IDEA exhaustion is a jurisdictional requirement" because it has certain exceptions, it has also stated that it is "bound by [its] precedent" on this issue and that, in any event, when a school district preserves this argument, it must be addressed. *Id.* at 130 & n.6.

2.   Exhaustion of Remedies

The District asserts that Counts I, II, V, VI and VII should be dismissed based upon Plaintiffs' failure to exhaust administrative remedies. Claims asserted under § 1983, the ADA and Section 504 do not have exhaustion requirements. Here, however, the issue turns on whether, as the District suggests, Plaintiffs' claims fall under the IDEA. If so, the IDEA's exhaustion requirements are relevant to the disposition of this issue.

The IDEA provides that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, **except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter**.

20 U.S.C. § 1415(*l*) (emphasis supplied).[4] The Supreme Court has held that this language "compels exhaustion when a plaintiff seeks 'relief' that is 'available' under the IDEA." *Fry v. Napoleon Community Schools*, 580 U.S. 154, 166 (2017). Resolution of this issue turns on whether the gravamen of the plaintiff's suit involves the denial of the IDEA's core guarantee, a free appropriate public education ("FAPE"). *Id.*

---

[4] Plaintiffs contend that exhaustion is not required for ADA claims because only the Office for Dispute Resolution ("ODR") has jurisdiction to resolve IDEA claims in Pennsylvania and the ODR lacks jurisdiction over ADA suits. In support, they cite three decisions by the ODR which are not accessible on WESTLAW and which they have not supplied. (ECF No. 24 at 7 & n.37.) In any event, even if these decisions support Plaintiffs' argument, they cannot be reconciled with the express wording of the IDEA itself, which specifically cites the ADA as an example of a statute for which exhaustion of FAPE-based claims is required. *See also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 273-74 (3d Cir. 2014) (holding that ADA retaliation claims that "are related to the provision of FAPE under 20 U.S.C. § 1415(b)(6) . . . must be exhausted.")

In *Fry,* the Supreme Court asked two hypothetical questions that are key to this analysis:

First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Id.* at 171.

In *Fry*, the Supreme Court declined to decide whether exhaustion would be required if the plaintiff complained of the denial of a FAPE but sought damages that were not available under the IDEA (e.g., money damages). *Id.* at 165 n.4. More recently, however, the Court addressed this question and held that: "The statute's administrative exhaustion requirement applies *only* to suits that 'see[k] relief . . . also available under' IDEA. And that condition simply is not met in situations like ours, where a plaintiff brings a suit under another federal law for compensatory damages—a form of relief everyone agrees IDEA does not provide." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 147-48 (2023).[5]

A FAPE includes not only "'instruction' tailored to meet a child's 'unique needs,'" but also "sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry*, 580 U.S.

---

[5] Therefore, the holding of the Court of Appeals that "a plaintiff's request for remedies not available under the IDEA does not remove the claim from being subject to exhaustion," *Wellman*, 877 F.3d at 131 n.7, is no longer good law. The same is true of a 2020 case cited by the District in which Judge Horan stated that "it is irrelevant, for purposes of administrative exhaustion, that Plaintiffs here seek remedies that are unavailable under the IDEA." *D.C. by & through A.T. v. Pittsburgh Pub. Sch.*, 2020 WL 3195750, at *7 (W.D. Pa. June 15, 2020). That opinion was accurate at the time, as it was based on Third Circuit case law which is no longer valid.

at 158 (quoting 20 U.S.C. § 1401(26), (29)). The IDEA further obligates schools to identify, locate, and evaluate all children with disabilities, in order to ensure these children receive a FAPE—an obligation known as the "Child Find" obligation. 20 U.S.C. § 1412(a)(3).

The Third Circuit has held that there are four exceptions to the exhaustion requirement: "(1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm." *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014) (citation omitted). The party seeking to be excused from exhaustion bears the burden of establishing an exception. *See Honig v. Doe*, 484 U.S. 305, 327 (1988).

With respect to the futility exception, the Court of Appeals has held that: "There may be other very narrow exceptions permitting the exhaustion requirement to be waived before filing a § 1983 claim, such as where the parents of a deceased child seek damages for a school board's failure to provide IDEA services while the child was still alive." *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007).

A number of courts have held that in the case of a deceased child, the exhaustion requirement can be waived because administrative remedies would be futile. *See Beam v. West Wayne Sch. Dist.*, 2018 WL 6567722, at *5 (M.D. Pa. Dec. 13, 2018) (noting that "resolving defects in an education plan for a child who is no longer alive would not 'usurp' the school district's authority in the manner protected by the exhaustion requirement," "allowing an exception based on the death of a student will not incentivize parents and care givers to wait to bring their IDEA claims in order to forego administrative procedures in favor of bringing their claims directly in court" and "futility of the administrative remedy is the foreseeable consequence of an IDEA

claim for a student who is no longer alive, given that parents have nothing to gain from the equitable remedies available in administrative proceedings under the IDEA"). *See also Weiser v. Elizabethtown Area Sch. Dist.*, 2018 WL 1071929, at *4 (E.D. Pa. Feb. 27, 2018); *Krebs v. New Kensington-Arnold School District*, 2016 WL 6820402 (W.D. Pa., Nov. 27, 2016); *Taylor v. Altoona Area Sch. Dist.*, 737 F.Supp.2d 474, 482 (W.D. Pa. 2010) (IDEA, ADA, Section 504 and Fourteenth Amendment claims); *Susavage v. Bucks County Schools Intermediate Unit No. 22*, 2002 WL 109615, at *19 (E.D. Pa. Jan. 22, 2002).[6]

While acknowledging this line of cases, the District attempts to distinguish them on the ground that Collin was diagnosed with OCD in 2018 and Skroupa had until 2020 to request an impartial hearing. *See* 20 U.S.C. § 1415(f)(3)(C) (imposing a statute of limitations of two years to raise an IDEA claim). In support, it cites *Taylor v. Altoona Area School District*, 737 F. Supp. 2d 474, 483 (W.D. Pa. 2010), which refers to the two-year statute of limitations.[7] The District contends that since no requests were made within this time period, Plaintiffs' obligation to seek administrative remedies was not futile and should not be waived. Plaintiffs respond that Skroupa contacted the District multiple times between 2020 and Collin's death in 2022 regarding Collin's needs.

The District has not explained the significance of its distinction. Regardless of when Collin was diagnosed with OCD, Skroupa alleges that she notified the District beginning in 2020 about his need for services, but her requests went unanswered for approximately two years until Collin's

---

[6] Moreover, as explained above, a claim that does not seek injunctive relief available under the IDEA will not be subject to the statute's exhaustion requirement and a claim involving a deceased child by definition will never seek such relief.

[7] In that case, however, the court found that the exhaustion requirement was waived because the child had died.

suicide.

Counts I and II allege that Collin was deprived of his rights under Section 504 and the ADA, respectively. They request compensatory damages, which are not available under the IDEA, and Collin's death forecloses the ability of the District to provide FAPE-based relief. Therefore, these claims are not subject to the exhaustion requirement.

Count V alleges an associational discrimination claim on behalf of Skroupa under the ADA and Section 504. The Complaint requests monetary damages, which are not available under the IDEA, and Collin's death forecloses the ability of the District to provide FAPE-based relief. Therefore, this claim is not subject to the exhaustion requirement.[8]

Count VI alleges due process claims arising out of Collin's deprivation of his right to life and the denial of Skroupa's liberty interests in the care of her child. They request monetary damages that are not available under the IDEA, they are not directly related to the denial of a FAPE and Collin's death forecloses the ability of the District to provide FAPE-based relief in any event. Therefore, the claim is not subject to the exhaustion requirement.

Finally, Count VII alleges a failure to train claim under the due process clause. Plaintiffs contend that that it is not FAPE-based, as it does not relate to the quality or expense of education, but rather the District's failure to heed Skroupa's warnings and implement any system for detecting and protecting Collin and similarly situated students. Even if it is FAPE-based, Collin's death forecloses the ability of the District to provide FAPE-based relief. Therefore, the claim is not subject to the exhaustion requirement.

---

[8] As discussed below, however, Counts V, VI and VII are subject to dismissal on other grounds.

Therefore, with respect to Counts I, II, V, VI and VII, the District's motion to dismiss for failure to exhaust administrative remedies will be denied.

### 3. Section 504 and ADA Claims

Plaintiffs allege claims under Section 504 and the ADA as to Collin (Counts I and II), M.R. (Counts III and IV) and Skroupa (Count V). The District contends that the claims are insufficient and should be dismissed under Rule 12(b)(6).

Both Section 504 and Title II of the ADA prohibit discrimination against individuals with disabilities. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. The Court of Appeals has held that:

> Because the same standards govern both the [plaintiffs' Section 504] and ADA claims, we may address both claims in the same breath. *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." (citation omitted)). To prevail on a violation of either of those statutes, the [plaintiffs] had to demonstrate that [the student] (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability. *See Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991) (citing *Strathie v. Dep't of Transp.*, 716 F.2d 227, 230 (3d Cir. 1983)).

*Chambers ex rel. Chambers v. School Dist. of Phila. Bd of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (footnotes omitted). The failure to provide a FAPE "violates IDEA and therefore could violate [the RA]." *Id.* (citations omitted).

In addition, to recover compensatory damages, a plaintiff must demonstrate that the discrimination was "intentional." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013). To prove intentional discrimination, a claimant must prove at least deliberate indifference, *id.* at 263, and to plead deliberate indifference, a claimant must allege "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge." *Id.* at 265 (emphasis omitted). *See Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir.

2018).[9] "Deliberate indifference does not require a showing of personal ill will or animosity toward

the disabled person." *D.E.*, 765 F.3d at 269 (internal citation and quotation marks omitted).

### a.   Claims Raised on Behalf of Collin

Both Section 504 and the ADA define an "individual with a disability" as any person who

has "a physical or mental impairment which substantially limits one or more of such person's

major life activities." 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). The statutes further state that

"major life activities include, but are not limited to, caring for oneself, performing manual tasks,

seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The District argues that, although the Complaint alleges that Collin had OCD, it does not

allege how the diagnosis substantially limited one or more of his major life activities. It further

argues that Plaintiffs have not alleged when the District knew or should have known that Collin

was diagnosed with OCD or when he began struggling at school, and as such, they have not alleged

that the District failed to respond within a reasonable time.

Plaintiffs respond that OCD requiring daily psychotherapy meets the ADA and Section 504

criteria of a mental or physical impairment that substantially limits one or more major life activities

and that Skroupa informed the District about Collin's diagnosis and outside treatment. Further, she

requested a space in the school where he could privately attend virtual therapy, which was denied,

forcing him to attend therapy from Skroupa's car in the school parking lot.

---

[9] Somewhat oddly, Plaintiffs insist that their cause of action is for deliberate indifference (ECF No. 24 at 12). However, as even their citations show, their claims are that Collin and M.R. were excluded from participating in a school program based on disability, with the additional requirement that intentional discrimination (which is necessary for recovering compensatory damages) requires a showing of deliberate indifference.

The Court concludes that the allegations that Collin had OCD which required daily psychotherapy sessions and that he was struggling at school are sufficient to state a claim that he had a mental impairment that substantially limited his major life activity of learning. "Regulations clarifying what constitutes a disability under the ADA state that 'major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia' substantially limit major life activities and should be considered disabilities." *Jones v. Thomas Jefferson Univ. Hosps., Inc.*, 2019 WL 5588824, at *8 (E.D. Pa. Oct. 29, 2019) (quoting 29 C.F.R. § 1630.2(j)(3)(iii)). Moreover, the Complaint alleges that Skroupa notified the District of Collin's diagnosis and psychotherapy needs in 2020, but no action was taken for the approximately two years prior to his death. These allegations are sufficient to state a claim that the District failed to respond within a reasonable time.

The District also contends that the Complaint does not allege that it denied Collin the benefits of an educational program or otherwise discriminated against him on the basis of his disability. It notes that Collin did not have a 504 Plan. *See Beam v. Western Wayne Sch. Dist.*, 165 F. Supp. 3d 200, 209 (M.D. Pa. 2016) ("Alleging that the School District officials consistently violated C.B.'s Section 504 Plan, thereby avoiding their duties under the plan, is sufficient to state a claim that C.B. was denied access to an appropriate educational program because of his disability.") Plaintiffs respond that the failure of the District to create a 504 Plan for Collin is the basis for their claim since that is how he was denied the benefits of a program and discriminated against.

The Court concludes that the Complaint adequately alleges that the District denied Collin the benefits of an educational program. The District cites no authority to support its counterintuitive suggestion that a school district may be held liable for failing to implement a 504

15

Plan but not for failing to create such a plan in the first instance.

Finally, the District argues that Plaintiffs have not alleged facts to support the contention that it was deliberately indifferent to Collin's needs. It again cites cases in which a school district failed to follow a 504 Plan and contends that they are distinguishable from the facts alleged here.

Once again, the District's citations are not on point. Plaintiffs allege that Skroupa notified the District about Collin's diagnosis and therapy needs, but the District refused to allow him to access virtual therapy from within the school and took no other action to support his needs. These allegations are sufficient to support a claim of deliberate indifference. *See D.C.*, 415 F. Supp. 3d at 658 (allegations that the district knew that a student had ADHD and ODD with frequent outbursts in school for nearly two years, but responded only with disciplinary measures, were sufficient to allege deliberate indifference). Therefore, with respect to Counts I and II, the District's motion to dismiss for failure to state a claim will be denied.

b.  Claims Raised on Behalf of M.R.

The District contends that Plaintiffs have not sufficiently pleaded ADA or Section 504 claims on behalf of M.R. It cites authority holding that: "A plaintiff cannot make out an RA claim simply by proving (1) that he was denied some service and (2) he is disabled. The state must have failed to provide the service for the sole reason that the child is disabled." *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) (citation omitted).

The District argues that the Complaint alleges only that it was put on notice at some time after November 29, 2022 that M.R. had various diagnoses, the District issued a Permission to Evaluate in "early February 2023," the family refused to attend requested meetings and that the District issued a draft 504 Plan on March 22, 2023. It further argues that the Complaint fails to

16

allege deliberate indifference; rather the allegations indicate that the District did not know that M.R. was disabled.

Plaintiffs respond that the Complaint alleges, among other things, that after M.R. found her deceased brother on January 6, 2022, the District provided no counseling and undertook no mental health precautions to help M.R. cope with Collin's suicide, even after her grades suffered. Further, she advised her English teacher that she was struggling. Regardless, the District took no action until August 31, 2022, and then only to suggest that M.R. be enrolled in a program but did not undertake any Section 504 steps. Further despite receipt of a November 29, 2022 letter outlining M.R.'s diagnoses through STAR, the District did not issue a Permission to Evaluate until February 2023 and ignored the family's request for immediate measures. And the District did not provide an Evaluation Report and a draft 504 Plan until March 22, 2023.

The Court concludes that for the purposes of a motion to dismiss, Plaintiffs have sufficiently alleged violations of Section 504 and the ADA as to M.R. The District knew of Collin's suicide, M.R.'s letter to her English teacher and the STAR letter outlining her diagnoses but delayed in taking action for a number of months. At this stage, these allegations are also sufficient to allege deliberate indifference to M.R.'s needs. Therefore, with respect to Counts III and IV, the District's motion to dismiss for failure to state a claim will be denied.

c.  Claims Raised on Behalf of Skroupa

"'It is widely accepted that under both the [Rehabilitation Act] and ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person.'" *S.K. v. North Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 711 (W.D. Pa. 2015) (quoting *McCullum v. Orlando Regional Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) and citing *Doe v. County of Centre Pa.*, 242 F.3d 437, 447 (3d Cir. 2001) ("The protections

of the ADA extend to 'qualified individuals' who are discriminated against because of their relationship or association with individuals who have a known disability.")). *See* 42 U.S.C. § 12112(b)(4) (defining discrimination to include "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."); 28 C.F.R. § 35.130(g).

> However, to state a claim for associational discrimination, a plaintiff must allege:
>
> (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination.

*S.K.*, 146 F. Supp. 3d at 711-12 (citations omitted). *See also United States v. Nobel Learning Communities, Inc.*, 2010 WL 1047730, at *4 (E.D. Pa. Mar. 19, 2010) (associational discrimination "requires a separate and distinct denial of a benefit or service to a non-disabled person; it may not be premised on a derivative benefit or harm based on treatment towards a disabled person").

The District contends that Skroupa has not alleged a separate and direct injury but rather a derivative one. It cites *D.C.*, in which the court held that despite the toll taken on a mother and grandmother due to D.C.'s issues, the injuries sustained by them were not "direct injuries" that are required for associational discrimination claims. Rather they were "indirect, or derivative, injuries that occurred as a result of the District's actions toward D.C., not as a result of actions directed at Mother and Grandfather." 415 F. Supp. 3d at 667.

Plaintiffs suggest that the harm to Skroupa is "not the 'toll' from observing the District's treatment of her child as was the case in *D.C.*; rather, her claim centers on the District's failure to listen to her as the guardian of a person with disabilities and the subsequent injury stemming from that disregard." (ECF No. 24 at 19.) They fail to explain the significance of this distinction,

however. In fact, the District's failure to "listen" to Skroupa actually meant failing to provide services to Collin and he sustained the direct injury. Skroupa undoubtedly suffered as a result of Collin's suicide, but no authority supports linking this injury to the District's acts and omissions.

Plaintiffs have not cited any case in which a parent of a child who was denied services under the IDEA, ADA or Section 504 was allowed to proceed with an associational discrimination claim under similar circumstances. Likewise, the Court has not found any support for such a claim. Therefore, with respect to Count V of the Complaint, the District's motion to dismiss will be granted.

### 4.  Due Process Claims

Plaintiffs allege in Count VI that Collin was deprived of his due process right to life and Skroupa was deprived of her liberty interest in the care of her child. Defendants move to dismiss these claims for failure to state a claim upon which relief could be granted.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The substantive aspect of the due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

### a.  Claim Raised on Behalf of Collin

The parties agree that the due process clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). The Supreme Court carved out a narrow exception when a special relationship has been established because "the State takes a person into its custody and holds him there against his will."

*Id.* at 199-200. And the Third Circuit has recognized a second exception: "the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (citation omitted). This is known as the state-created danger theory.

In *Morrow*, the Court of Appeals confirmed its long-standing holding that public schools do not have a "special relationship" with students. *Id.* at 170. Plaintiffs do not suggest otherwise. Rather, they rely on the state-created danger theory, the elements of which are as follows:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the conscience;
>
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 177 (quoting *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

In *Morrow*, parents contended that a school district was liable under the state-created danger theory for suspending a bully but then allowing her to return to school, where she resumed harassing their daughters. But the court held that the complaint "simply attempts to redefine clearly passive inaction as affirmative acts." *Id.* at 178. The plaintiffs were left in the same position as they were before the school took any action. Therefore, they could not allege a claim based on the state-created danger theory.

Even more significantly, in *Sanford v. Stiles*, 456 F.3d 298 (3d Cir. 2006), the court held that a guidance counselor who failed to prevent a student from committing suicide after she read

a note the student wrote and spoke with him but concluded he was not suicidal did not act with a degree of culpability that shocked the conscience and did not create the danger or render the student more vulnerable than he was previously. *Id.* at 311-12.[10]

Plaintiffs argue that "A state actor may be held liable under the state-created danger doctrine for failing to prevent a suicide where they did not respond to a pattern of past injuries or there exists an incredibly obvious risk." (ECF No. 24 at 21.) However, they have not alleged that Collin had a pattern of past injuries or that an incredibly obvious risk existed. Without additional facts, the fact that he had OCD and required daily psychotherapy does not lead to a conclusion that the District knew or should have known that he presented an obvious risk of suicide. *See Sanford*, 456 F.3d at 311 (noting that no one, including the student's mother, the girlfriend who broke up with him or his uncle—a licensed social worker—believed that he was at risk of harm.) *See also Beam*, 165 F. Supp. 3d at 214 ("Plaintiffs' allegation that C.B. committed suicide as a result of Defendants' failure to communicate C.B.'s academic failures to Plaintiffs in accordance with C.B.'s Section 504 plan is insufficient to support liability . . . [because] the causation, if any, is too attenuated.")

Moreover, because the District's failure to act left Collin in the same position he was in previously, it did not create the danger or render him more vulnerable. *See Beam*, 165 F. Supp. 3d at 215 ("Although the implementation of the Section 504 Plan was an affirmative act by the school officials, this plan did not create a new danger to C.B. or render him more vulnerable to danger

---

[10] The District argues that Plaintiffs cannot allege a claim under the state-created danger theory because they do not allege any acts by private actors. (ECF No. 15 at 18.) This is not a required element; if it were, no parents of a child who committed suicide could ever bring suit, but the *Sanford* case never makes this point.

than had they not acted at all.")

Thus, Plaintiffs have failed to state a claim under the state-created danger theory and the claim asserted on behalf of Collin will be dismissed.

b. Claim Raised on Behalf of Skroupa

Plaintiffs also allege a claim on behalf of Skroupa for deprivation of her liberty right to the care, custody and control of her son, which the Supreme Court has held "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

However, courts have held that "the parents' liberty interest will only be implicated if the state's action 'deprived them of their right to make decisions concerning their child,' and not when the action merely 'complicated the making and implementation of those decisions.'" *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011) (quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005)).

As noted in *D.C.*:

> Mother, who has cognizable liberty interest in the care, custody, and control of her son, D.C., alleges that the District's failure to adequately support D.C. caused D.C.'s victimization by school police and staff, which in turn caused the loss and diminution of her liberty interest. This chain of events, which starts with a failure to act, is too attenuated to be the deliberate decision to deprive or interfere that is required to state a claim under the Fourteenth Amendment's Due Process Clause.

415 F. Supp. 3d at 668.

Similarly, the District argues, Plaintiffs allege that the District's failure to adequately support Collin exacerbated his struggles and contributed to his suicide, but this chain of events starts with a failure to act and is too attenuated to be the deliberate decision to deprive or interfere for purposes of the due process clause. Plaintiffs do not address this issue in their response. While

they discuss Skroupa's relationship with Collin and contend that the District's failure to heed Skroupa's requests regarding his mental health needs foreseeably led to a denial of care, they do not explain how the District's acts and omissions can be linked to a denial of Skroupa's parental rights.

As Plaintiffs have failed to state a claim for deprivation of Skroupa's parental rights under the due process clause or a due process claim on behalf of Collin, the District's motion to dismiss will be granted with respect to Count VI.

    5. <u>Failure to Train Claim</u>

In Count VII, Plaintiffs allege that the District failed to train and supervise its agents and employees who are charged with the care and custody of students with mental health needs that requires special education, and this failure amounts to deliberate indifference to the rights of vulnerable students like Collin.

The District moves to dismiss this claim on the grounds that Plaintiffs have not identified an underlying constitutional violation nor have they identified specific training not provided that would have reasonably prevented his suicide. In turn, Plaintiffs argue they have alleged that the District knew about the difficulties the family was facing but chose not to act as a matter of policy.

As explained above, Plaintiffs have failed to state a claim for an underlying constitutional violation in Count VI.[11] Without an underlying constitutional violation, a failure to train claim cannot stand. *See Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996) ("Of course, had there not been an underlying constitutional violation in the first instance, plaintiff's 'failure to train'

---

[11] Plaintiffs have sufficiently pleaded claims in Counts I-IV, but these are statutory and not constitutional claims.

claim against the City would not stand.")

In addition, as the Court of Appeals has stated, "[d]eliberate indifference stems from government inaction, namely a [municipality's] failure to train its employees on avoiding constitutional violations." *Wright v. City of Philadelphia*, 685 F. App'x 142, 147 (3d Cir. 2017). "To show the deliberate indifference required for a 'failure to train' claim, a § 1983 plaintiff must show 'a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* (quoting *Board of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). Deliberate indifference "may stem from a failure to act despite notice [that municipal] employees continually violate citizens' rights." *Wright*, 685 F. App'x at 147. Ordinarily, finding policymakers deliberately indifferent based on a failure-to-train theory requires "[a] pattern of similar constitutional violations by untrained employees." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). *See Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 758-59 (W.D. Pa. 2018) (plaintiff did not allege that school district had notice of a pattern of similar violations prior to student's suicide).

Here, Plaintiffs have not alleged a pattern of similar constitutional violations and have failed to state a claim that the District was deliberately indifferent based on a failure to train theory. Therefore, with respect to Count VII, the District's motion to dismiss will be granted.

In summary, the District's motion to dismiss will be granted with respect to Counts V-VII and denied in all other respects.

B.  Motion to Dismiss by PDE

In Count VIII, Plaintiffs allege claims under Section 504 and the IDEA against the PDE as

the agency ultimately responsible for the implementation of both statutes.[12] The PDE argues that Plaintiffs fail to state a claim upon which relief could be granted under Section 504 because Collin's OCD was not a "disability" and M.R. was provided with a 504 Plan.

As explained above, Collin's OCD does constitute a disability for purposes of Section 504. *See* 29 U.S.C. § 705(20)(B) (defining an individual with a disability as "any person who has a disability as defined in section 12102 of Title 42."); 29 C.F.R. § 1630.2(j)(3)(iii) (defining OCD as a disability under the ADA); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282-83 (3d Cir. 2012) (the "substantive standards for determining liability under [Section 504] and the ADA are the same").

Moreover, although M.R. was eventually provided with a 504 Plan, this occurred only after a year following Collin's death and eight months after the District was notified of M.R.'s needs. Whether the underlying facts will support Plaintiffs' claim that the District's actions were untimely and inadequate cannot be determined on a motion to dismiss.

Therefore, these arguments fail to provide a sufficient basis for dismissal of Plaintiffs' claims.

As discussed below, respect to the IDEA claim, the PDE also argues that it could only be held liable for "systemic violations" that are not pleaded in this case.

### 1. Distribution of Responsibilities Under the IDEA

As noted above, the IDEA requires institutions that receive federal education funding to provide all children with disabilities with a "free appropriate public education" or "FAPE." 20 U.S.C. § 1400(d)(1)(A); § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist.*,

---

[12] Congress has abrogated sovereign immunity for claims under the IDEA. 20 U.S.C. § 1403. The Court of Appeals has held that a state's waiver of immunity by accepting federal financial assistance is valid. *See A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234 (3d Cir. 2003).

580 U.S. 386, 390 (2017). Pursuant to the IDEA, Congress provides federal funds to each state that submits a plan with policies and procedures to ensure that eligible students with disabilities receive FAPE. 20 U.S.C. §§ 1411-1412.

In turn, states, through their respective State Education Agencies ("SEAs"),[13] apportion these federal funds to their Local Education Agencies ("LEAs")[14] if the LEAs "submit a plan that provides assurances to the [SEA]" that the LEA meets certain IDEA eligibility requirements. 20 U.S.C. § 1413(a). LEAs are responsible for identifying and evaluating students with disabilities, developing and implementing individualized education programs ("IEPs"), and providing educational programming and services to their students. 20 U.S.C. § 1414; 22 Pa. Code §§ 14.121-14.125, 14.131-14.133, 14.151-14.158.

The IDEA provides that:

> The State educational agency is responsible for ensuring that--
> (i) the requirements of this subchapter are met;
> (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency--
>> (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
>> (II) meet the educational standards of the State educational agency.

20 U.S.C. § 1412(a)(11)(A).

The Court of Appeals has held that this provision reflects "state's primary responsibility to provide a publicly-supported education for all children and a specific intent to centralize this

---

[13] An SEA is "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools." 20 U.S.C. § 1401(32).

[14] An LEA is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State." 20 U.S.C. § 1401(19)(A).

responsibility." *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 696 (3d Cir. 1981). "Though *Kruelle* did not directly address whether the state would be responsible for remedying past failures by the local agency, it affirmed the district court's decision that the state would be responsible for 'the burden [of] coordinating efforts and financial arrangements for [the child's] education." *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp. 3d 510, 514 (E.D. Pa. 2014) (quoting *Kruelle*, 642 F.2d at 697).

Another subsection of the IDEA provides that SEAs shall use the payments that would otherwise be available to LEAs to provide special education and related services to children with disabilities if, among other things, the LEA "is unable to establish and maintain programs of free appropriate public education that meet the requirements of [the IDEA]." 20 U.S.C. § 1413(g)(1)(B).

In *Charlene R.*, the court stated that:

Sections 1412(a)(11)(A) and 1413(g)(1), when combined with the congressional intent as discerned by *Kruelle*, clearly signal that the SEA is to bear primary responsibility for ensuring that every child receives the FAPE that he or she is entitled to under the IDEA. While the SEA ordinarily delegates actual provision of this education to LEAs, the SEA by statute must step in where a LEA cannot . . . provide a child with a FAPE.

63 F. Supp. 3d at 516.[15]

---

[15] The court also stated that the SEA must step in if the LEA "will not" provide a child with a FAPE. However, since 1997, § 1413(g)(1)(B) now provides that SEAs shall use the payments only if the LEA is "unable" to establish and maintain programs that meet the statute's requirement. *See Lejeune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785, 799 (E.D. Pa. 2018), *aff'd*, 779 F. App'x 984 (3d Cir. 2019). *Charlene R.* and other cases that have continued to use the "unwilling or unable" language have done so relying on cases interpreting the predecessor statute. As currently written, "the IDEA does not require an SEA to step in and fulfill IDEA resolution agreements when the LEA is merely 'unwilling' to comply." *Lejeune*, 327 F. Supp. 3d at 800.

2.  <u>Systemic Violations</u>

The PDE argues that SEAs are only responsible for "systemic violations" of the IDEA, not individual failures as alleged in this case. According to Plaintiffs, the Third Circuit Court of Appeals has never endorsed this restrictive interpretation of the IDEA and the PDE cites unpersuasive authority from other jurisdictions to support its argument. At any rate, Plaintiffs assert, they have alleged systemic violations in the Complaint.

The Court of Appeals for the Eighth Circuit has held that Section 1412(a)(11)(A)(i) "does not turn every 'local educational agency' under the statute . . . into the agent of the 'State educational agency' as a matter of federal law, so that the latter automatically becomes legally liable for all transgressions of the former." *John T. ex rel. Robert T. v. Iowa Dep't of Educ.*, 258 F.3d 860, 865 (8th Cir. 2001) (quoting *Beard v. Teska*, 31 F.3d 942, 954 (10th Cir. 1994), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598 (2001)). *See also Carnwath v. Grasmick*, 115 F. Supp. 2d 577, 582 (D. Md. 2000) ("IDEA does not create a type of respondeat superior liability, imputing liability to SEAs for every local deviation from the State-created standards."); *id.* at 585 (the SEA "will not be liable in situations where it was neither notified of the relevant decisions nor involved in those decisions in the first place.")

However, as noted in *Charlene R.*:

> both of these cases were analyzing the liability of a SEA for attorneys' fees incurred in a proceeding against a LEA. . . .These cases were determining whether the plaintiffs had been "prevailing parties" against the SEA in these underlying actions, which is not a comparable inquiry to the one at hand—determining whether a SEA should be ultimately responsible for ensuring a child receives the FAPE he is entitled to under the IDEA.

63 F. Supp. 3d at 515 n.2.

28

In *Gadsby by Gadsby v. Grasmick*, the Court of Appeals for the Fourth Circuit noted that "it seems clear that an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented." 109 F.3d 940, 952 (4th Cir. 1997). Based on this language, a few courts have concluded that:

> "[S]ystemic violation" of the State's responsibilities under the IDEA might give rise to state liability. *See Reinholdson v. Minnesota*, 346 F.3d 847, 851 (8th Cir. 2003). A systemic claim is one which "implicates the integrity of the IDEA's dispute resolution procedures themselves, or requires restructuring of the education system itself in order to comply with the dictates of the [IDEA]." *Mrs. M. v. Bridgeport Bd. of Educ.*, 96 F.Supp.2d 124, 133 n.12 (D. Conn. 2000).

*J.D.G. v. Colonial Sch. Dist.*, 748 F. Supp. 2d 362, 370 (D. Del. 2010). However, both the *Reinholdson* and *Mrs. M.* cases cited in *J.D.G.* discussed structural versus substantive claims for purposes of the exhaustion requirement, not the substantive requirement.

The text of the IDEA does not use the word "systemic" and no court of appeals has endorsed the PDE's reading of the statute to require a "systemic" violation by the state.[16] As discussed above, the Third Circuit has held only that it was appropriate to place "the burden for coordinating efforts and financial arrangements for [the student's] education on the State Board of Education." *Kruelle*, 642 F.2d at 697. *See also M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 340 (3d Cir. 2003) ("the participating state retains primary responsibility for ensuring compliance with the IDEA and for administering educational programs for disabled children.") Moreover, based upon a full record, it is possible that there are underlying

---

[16] The Court notes that in *Price v. Commonwealth Charter Acad. Cyber Sch.*, 2018 WL 1693352, at *6-7 (E.D. Pa. Apr. 6, 2018), the court dismissed IDEA claims when the plaintiff did not complain of any systemic failures on the part of the Bureau of Special Education or allege that its dispute resolution procedures themselves violated the dictates of the IDEA.

facts to support a claim that the PDE may have failed to ensure that "the requirements of this subchapter are met," 20 U.S.C. § 1412(a)(11)(A)(i), including the requirement to provide a FAPE, 20 U.S.C. § 1412(a)(1), and the Child Find requirement, 20 U.S.C. § 1412(a)(3).

At any rate, for purposes of resolving the motion to dismiss, Plaintiffs have alleged that the violations of the IDEA and Section 504 were systemic. (Compl. ¶¶ 124-28.) In addition, they request "injunctive relief requiring the revision of PDE's supervisory practices regarding the identification and protection of handicapped students by [LEAs]." (Compl. at 20.) Thus, their allegations do request "restructuring of the education system itself in order to comply with the dictates of the [IDEA]."

Accepting the allegations of the Complaint as true, Plaintiffs have stated a claim against the PDE under the IDEA. The PDE may revisit this issue as appropriate based upon a fully-developed record.

Therefore, the motion to dismiss filed by the PDE will be denied.

**IV.** **Conclusion**

For the reasons discussed, the motion to dismiss filed by the District will be granted with respect to Counts V, VI and VII and denied in all other respects. The motion to dismiss filed by the PDE will be denied.

Appropriate orders will follow.


Dated: July 3, 2024                    /s/ Patricia L Dodge
                                       PATRICIA L. DODGE
                                       United States Magistrate Judge